## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MAURICE A. YOUNG,** <br> *Plaintiff,* <br><br> **v.** <br><br> **JABIL, INC. and JABIL BRANDYWINE, INC.,** <br> *Defendants.* | **CIVIL ACTION** <br><br> **NO. 23-4992** |

Baylson, J.                                                                                    April 22, 2025

### MEMORANDUM RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Presently before this Court is Jabil, Inc. and Jabil Brandywine, Inc.'s (Defendants')

Motion for Summary Judgment.  For the reasons set forth below, Defendants' Motion is denied.

### I.    FACTUAL BACKGROUND

Plaintiff, Maurice Young ("Young"), was employed by Defendant, Jabil, Inc. ("Jabil") in

the role of Machine Operator I ("Operator") from June 2019 until his termination on November

1, 2022.  Am. Compl. at ¶ 8, ECF 9.  Young was employed by Jabil's predecessor entity, DePuy

Synthes since 2017.  Id. at ¶ 9.  Young suffers from osteoarthritis in his hips which limits his

ability to stand, sit, and walk.  Id. at ¶ 10.

On July 12, 2021, Young took a leave of absence that lasted until January 2022.

Defendants' Statement of Undisputed Facts ("Def. Facts") at ¶¶ 16, 20, 22, ECF 22-3.  Young

took a second leave of absence from January 2022, until he exhausted his disability insurance in

June 2022.  Id. at ¶ 22, 25, 26.  Following the exhaustion of his disability benefits, on June 27,

2022, Young texted Jabil's Senior Regional Human Resources Manager, Jennifer Guie ("Guie")

and asked to return to work on a light-duty, part-time status.  Id. at ¶ 28.  Guie responded to

Young's text on either June 28, or June 29, 2022, and informed Young that his doctor needed to

complete medical paperwork so that Jabil could determine accommodations for his return to work.  Id. at ¶ 29; Response in Opposition to Motion for Summary Judgment ("Resp.") at 11. The next day, Guie sent a follow-up letter to Young that stated "to help [Jabil] determine if we can continue to accommodate your absences, we need to have your doctor fill out the attached form[,]" along with the required paperwork.  Def. Facts at ¶¶ 32-33.

Young's medical paperwork was originally due on July 6, 2022, Young submitted the paperwork on July 18, 2022.  Id. at ¶¶ 34, 46.  Nearly two months later, on September 12, 2022, Guie requested additional information from Young; Guie explained that this additional information would allow Jabil to make a determination on Young's part-time work status request. Pl. Ex. C, ECF 23-6.  On October 26, 2022, after still not receiving a response on his request to return to work on a part-time status, Young texted Guie to inquire about the status of his accommodation request.  Pl. Ex. E, ECF 23-8.  Two days later, on October 28, 2022, Guie sent Young a letter informing him that after reviewing his medical paperwork, Jabil would not be able to provide the accommodations outlined by his physician and could not identify a vacant position for which he was qualified and that as such Young would be terminated as of November 1, 2022. Def. Facts at ¶ 86.

On October 29, 2022, Young applied for the Engineering Technician I position ("Engineering Technician").  Id. at ¶ 88; Resp. at 12.  Young emailed Guie and asked for a new accommodation, that he be allowed to transfer from the Operator role to the Engineering Technician position.  Pl. Ex. E.  On October 31, 2022, Guie sent a Microsoft Teams chat to Chelsea Welch ("Welch"), the recruiter in charge of the Engineering Technician position, and asked Welch to not reject Young's application until the Engineering Technician position was filled because Young was an internal candidate.  Pl. Ex. M, ECF 23-16.  On November 1, 2022,

Guie emailed Young that Jabil could not accommodate his request to transfer to the Engineering

Technician position and Young's employment with Jabil was officially terminated.  Pl. Ex. N,

ECF 23-17; Def. Facts at ⁋ 93.

## II.    <u>PROCEDURAL HISTORY</u>

Young filed his initial Complaint on December 18, 2023.  ECF 1.  This case was initially

assigned to Chief Judge Goldberg.

On February 15, 2024, Defendants submitted a letter requesting a pre-motion conference,

in accordance with this Court's 12(b) Procedural Order.  ECF 6.  On February 21, 2024, Young

submitted a letter to this Court noticing his intent to withdraw Count III of his Complaint which

brought claims under 42 U.S.C. § 1981.  ECF 8.  On February 21, 2024, Young filed his

Amended Complaint.  ECF 9.  The Amended Complaint asserts two claims under the Americans

with Disabilities Act ("ADA"), Failure to Accommodate (Count I) and Retaliation (Count II).

This Court construes Count I as a claim of Disability Discrimination from which a Failure to

Accommodate claim flows.

On October 9, 2024, this case was reassigned to the undersigned.  ECF 19.  On January

31, 2025, Defendants filed the present Motion for Summary Judgment, ECF 22, and a Motion to

Strike the Report and Testimony of Plaintiff's Expert Witness, ECF 21.[1]  Young filed a Response

in Opposition to the Motion for Summary Judgment ("Response") on February 13, 2025, ECF

24, and to the Motion to Strike on February 14, 2025, ECF 24.  Young filed a Response to

Defendants' Statement of Undisputed Material Facts ("Defendants' Facts") and a Statement of

Counter Facts on February 20, 2025.  ECF 26.  On February 25, 2025, Defendants moved to

strike Young's Response to Defendants' Facts and Statement of Counter-Facts on the basis that it

---

[1] Defendants' Motion to Strike is pending.  This Court notes that it did not consider the testimony of Plaintiff's
expert, Dr. Dieckman, in ruling on summary judgment.

was filed six days late, ECF 31, which this Court denied on February 26, 2025, ECF 32.

Defendants filed a Reply to Young's Statement of Counter Facts on March 12, 2025.  ECF 34.

III.    **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, by "citing to particular parts of materials in the record," show that a fact is "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

IV.    **DISCUSSION**

The ADA prohibits an employer from discriminating "against a qualified individual with a disability because of the disability of such individual." Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 305 (3d Cir. 1999). Here, Young asserts three claims under the ADA: (1) Disability Discrimination (Count I), (2) Failure to Accommodate, a sub-claim under Disability Discrimination (Count I), and (3) Retaliation (Count II). Young also seeks punitive damages.

### A.  Count I: ADA Discrimination

To establish a prima facie case of disability discrimination under the ADA a plaintiff must demonstrate that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Tech. Inc., 134 F.3d 576, 580 (3d Cir. 1998).

For purposes of the present Motion, it is undisputed that Young is a disabled person within the meaning of the ADA and suffered an adverse employment decision as a result of discrimination. MSJ at 20. This matter turns on the second element, whether Young was a qualified individual. "[T]he burden is on the employee to prove that he is an otherwise qualified individual." Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996) (internal citations omitted).

### 1.  Qualified Individual

Courts engage in a two-part test to determine whether an employee is "a qualified individual with a disability." 29 C.F.R. § 1630.2(m). First, courts "must consider whether the individual satisfies the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc." Gaul, 134 F.3d at 580

(quoting 29 C.F.R. § 1630.2(m)). Second, courts "must consider whether or not the individual can perform the essential functions of the position held or desired, with or without reasonable accommodation." Id. (quoting 29 C.F.R. § 1630.2(m)). The determination of whether an employee is a qualified individual is made at the time of the employment decision. Id.

The parties only dispute the second consideration, whether Young could perform the essential Operator functions. Whether a function is an essential part of an employee's role "'is a factual determination that must be made on a case by case basis [based upon] *all* relevant evidence.'" Deane v. Pocono Med. Ctr., 143 F.3d 138, 148 (3d Cir. 1998) (*en banc*) (quoting 29 C.F.R. § 1630.2(n)). "The term 'essential function' does not include the 'marginal' functions of the position." Turner v. Hershey Chocolate U.S., 440 F.3d 604, 612 (3d Cir. 2006) (quoting 29 C.F.R. § 1630.2(n)(1)).[2]

At issue is what functions were essential to the Operator role and whether Young could perform those functions, with or without a reasonable accommodation. The parties dispute the following: (1) the essentiality of repetitive motions to the Operator role and Young's ability to perform repetitive motions, (2) the essentiality of traceability requirements to the Operator role and Young's ability to perform traceability requirements and, (3) whether Young posed a direct threat to himself or others.

### a. Repetitive Motions

---

[2] Reasons that a function may be considered essential include, but are not limited to (1) the reason the position exists is to perform that function; (2) the limited number of employees available among whom the performance of that function can be distributed; and/or (3) the function is so highly specialized so that the incumbent in the position is hired for their expertise or ability to perform the particular function. See Deane, 143 F.3d at 148. Evidence that a function is essential may include, but is not limited to, "[1] The employer's judgment as to which functions are essential; [2] Written job descriptions prepared before advertising or interviewing applicants for the job; [3] The amount of time spent on the job performing the function; [4] The consequences of not requiring the incumbent to perform the function; [5] The terms of a collective bargaining agreement; [6] The work experience of past incumbents in the job; and/or [7] The current work experience of incumbents in similar jobs." Id. (internal citations omitted).

First, this Court must consider whether repetitive motions were an essential part of the Operator role. Defendants assert that the Operator role required repetitive use of fingers and hands. MSJ at 6.[3] While Young conceded in his deposition testimony that the Operator role required use of hands and fingers, Young further elaborated that "[i]f, for whatever reason you couldn't finish it, other people c[ould] finish it." Def. Young Dep. at 186:6-8. When asked whether completing five lots per day was part of the Operator role, Young answered that Jabil made "huge mistakes [] in their job description." Id. at 186:20 – 187:14. Young explained that there is a "big difference" between "5 lots of 30 pieces assembled together" and "5 lots of 120 total pieces assembled together." Id. at 187:11-14.

In Deane, plaintiff, a nurse, and defendant, a hospital, did not dispute that lifting heaving objects, including patients, was a critical job demand. 142 F.3d at 148. However, the Third Circuit reversed and remanded to the district court for further proceedings because it concluded that whether lifting heavy objects was an essential function of being a nurse was a factual question for the jury. Id. Likewise, in Skerski v. Time Warner Cable Co., plaintiff's panic and anxiety diagnosis prevented him from climbing or working at heights. 257 F.3d 273, 276 (3d Cir. 2001). Plaintiff was employed by Time Warner to service cables, wires, and aerial cable plants. Id. The Third Circuit reversed the district court's grant of judgment as a matter of law to Time Warner because the definition of "essential function" set forth in 29 C.F.R. § 1630.2(n)(3), cautioned against a premature determination of what is an essential function. Id. at 280. Similarly, in Turner, plaintiff worked on an assembly line where she had to rotate peppermint patties, similar to the repetitive motions performed by Young in assembling medical devices.

---

[3] Defendants cite to Young's deposition testimony where he answered in the affirmative when asked whether the Operator role required "working with small parts and repetitive use of finger[s] and hands." MSJ at 5, Def. Young Dep. at 186:2-8, ECF 22-5.

440 F.3d at 606.  The Third Circuit reversed the district court's grant of summary judgment to Hershey because whether "rotating" was an essential function of the job was a fact issue that must be decided by the jury.  Id. at 614.

Like in Deane, the parties do not dispute that repetitive motions using the fingers and hands were a part of the Operator role.  However, the parties dispute the intensity of repetitive motions required, *i.e.* completing five lots comprised of thirty individual pieces as opposed to one hundred and twenty individual pieces.  See Def. Young. Dep. at 187:11-13.  Additionally, Young agrees that use of hands and fingers was required by the Operator role but asserts that if an Operator could not finish a lot, someone else could finish the lot instead.  See Id. at 186: 6-8. As such, Young does not concede that repetitive motions were an essential function of the Operator role, but rather one aspect of the role.  In Turner, whether "rotating" was an essential job function of an employee hired to rotate peppermint patties on an assembly line was a fact issue that had to be decided by a jury.  Similarly, whether repetitive motions were an essential function of Operator's assembling medical devices is a fact issue that must be decided by the jury.  This Court notes that Guie, Jabil's Senior Regional Human Resources Manager, responded "[no]" when asked if she had "determined what were the essential functions of the Machine Operator I role as of September 12, 2022."  Def. Guie Dep. at 69:23-25 – 70:1, ECF 22-6. Young and Guie's testimony together creates a genuine dispute of material fact as to whether repetitive motions were an essential Operator function.  Thus, this Court need not not turn to whether Young was able to perform repetitive motions, with or without a reasonable accommodation.

### b.  Traceability

As with repetitive motions, this Court must first determine whether traceability was an essential function of the Operator role.

To support their contention that traceability was an essential function of the Operator role Defendants assert that traceability is an FDA requirement.  MSJ at 7.  Defendants point to the fact that Young, Guie, and Young's supervisor, Chad Willman ("Willman") testified that traceability was an FDA requirement, and that Young testified that Operators followed the assembly process "from beginning to end for lot traceability."  Id. (citing Def. Young Dep. at 188:5-21; Def. Guie Dep. at 69:7-18; Def. Willman Dep. at 23:24 -24:2, ECF 22-7).  Willman's testimony supports Defendants' assertion that traceability was an essential Operator function.[4] However, Willman also testified that it was not expected for Operators to work without breaks. Def. Willman Dep. at 24:18-24.  Willman explained that traceability "tell[s] the story" of how a device is built but that story does not include the number or length of breaks that Operators take. Pl. Willman Dep. at 23:15-23, 26:24-27:13, ECF 23-11.  Additionally, neither Guie nor Young's testimony states that traceability was an essential Operator function.[5]  While Guie testified that

---

[4] Willman testified that traceability was an essential function of the Operator I role and applied to everything made at the facility.  Pl. Willman Dep. at 23:24 -24:6.
[5] See Def. Young Dep. at 188:5-19.

> Q: It says: the same operator must follow the process from beginning to end for lot traceability and must initial the date quantify for the lot.
> A: I can't agree with that because it depends. What they did here, to help you and help your team and anybody else, they gave a broad description on job duties here, and they're not breaking it down to what lot you're talking about, what size, how long it takes.
> Q: Right.  Because for business operations, you might have to work on a different part of any given day.
> A: Right

See Def. Guie Dep. at 69:10-18.

> Q: Is there a regulation titled traceability that I could find.
> A: I do not know.  I know that there's lot traceability. You have to know a lot at all times where it's at. If a product is recalled, it's in someone's body, you need to know exactly what lot it's from, where it's from. So, yes, that is a[n] FDA requirement.  Specifically where it's written, I'm not an expert on FDA requirements.

lot traceability is an FDA requirement, she also explained that she had not determined the essential Operator functions as of September 12, 2022.  Guie Dep. at 69:23-25 – 70:1. Defendants further contend that "[a]n essential duty of the Operator position is that operators 'follow the [assembly] process from beginning to end for lot traceability and must initial and date quantity for the lot.'"  MSJ at 7 (quoting Def. Young Dep. at 188:5-21).  However, this proposition mispresents Young's testimony.  Defendants quote the question asked of Young and not Young's response.  Young was asked, "[i]t says: the same operator must follow the process from beginning to end for lot traceability and must initial the date quantity for the lot."  Def. Young Dep. at 188:5-8.  To which Young responded, "I can't agree with that because it depends." Id. at 188:9.  Young responded similarly when asked "[d]oes the operator who is assembling the device, are they responsible for documenting all of these steps that you just talked about?"  Pl. Young Dep. at 51:22 – 52:1, ECF 36.  Young stated, "[t]hey're only responsible for documenting steps they do."  Id. at 52:2-3.

Willman and Guie's testimony suggest that lot traceability was required.  However, Willman's testimony that Operators were allowed breaks and Jabil's offer to accommodate Young's part-time schedule, contingent on Young providing additional information, suggest that it was not a requirement for Operators to remain on the assembly line from beginning to end to achieve lot traceability.  See Def. Willman Dep. at 24:18-24; Pl. Ex. C.  This coupled with Guie's testimony that she had not determined the essential Operator functions as of September 12, 2022, make it a fact question as to whether traceability was an essential function of the Operator role. This question must be resolved by a jury and this Court need not address whether Young was able to perform traceability functions.

### c. Direct Threat

The direct threat exception "allows discrimination if a disability 'poses a direct threat to the health or safety of others.'" Doe v. Cnty. of Centre, Pa., 242 F.3d 437, 447 (3d Cir. 2001) (internal citations omitted).  "A 'direct threat' exists when there is a '*significant risk* to the health or safety of others that cannot be eliminated by a modification of polices, practices, or procedures or by the provision of auxiliary aids or services.'" Id. (quoting 42 U.S.C. § 12182(b)(3)).  The direct threat exception can only be invoked where a risk is significant "[b]ecause few, if any, activities in life are risk free ... the ADA do[es] not ask whether a risk exists, but whether it is significant." Bragdon v. Abbott, 524 U.S. 624, 649 (1998).  To determine whether an individual poses a direct threat, courts must consider the (1) duration of the risk, (2) nature and severity of the potential harm, (3) likelihood that the potential harm will occur, and (4) imminence of the potential harm.  See Coleman v. Pa. State Police, 561 Fed. App'x 138, 144 n.9 (3d Cir. 2014) (non-precedential) (quoting 29 C.F.R.§ 1630.2(r)).  If a direct threat exists, an employer is not required to provide a reasonable accommodation.  See Chevron v. U.S.A. Inc. v. Echazabal, 536 U.S. 73, 122 (2002); Turner, 440 F.3d 604, 614 (3d Cir. 2006).

Defendants contend that Young is a threat to himself because the Operator role requires repetitive use of the fingers and hands and such actions, according to Young's doctor, Dr. Brenner, would exacerbate Young's injuries, evidenced by the fact that Young re-injured himself at work on two occasions, requiring him to take leave.  MSJ at 9.  Conversely, Young argues that he did not present a "direct threat" because he did not pose the potential for imminent and severe harm.  Resp. at 7.  Young further argues that as an Operator that assembled small handheld medical devices, he could not present a direct threat of any significance.  Resp. at 7.

Defendants rely on Clark v. SEPTA to support their contention that Young posed a direct threat to himself and others.  2008 WL 219223 (E.D. Pa. Jan. 24, 2008) (Diamond).  In Clark,

the plaintiff was employed as a vehicle and equipment mechanic.  Id. at 2.  This position was designated as a "safety sensitive" position by SEPTA and required employees to work at unprotected heights, drive buses, and possess a valid commercial driving license.  Id. at 2.  The plaintiff developed a seizure condition, because of which he suffered five seizures between 2000-2003, all of which required hospitalization.  Id. at 3.  The Court held that "[i]f Plaintiff had a seizure while driving a commercial vehicle, the harm could be catastrophic, as the DOT and SEPTA have recognized in formulating the physical standards for commercial drivers."  Id.

The nature and severity of the harm posed by Young's disability is far less extreme than that posed by the plaintiff in Clark.  In applying the direct risk factors, Defendants make no argument that Young's disability could harm others, only that Young may re-injure himself or exacerbate his disability.  MSJ at 9.  This is not the sort of serious risk typically contemplated by the direct threat exception.  For example, in Hartley v. Boeing Company, plaintiff, a firefighter, suffered from a chronic back injury.  2019 WL 4857357, at *6 (E.D. Pa. Sept. 30, 2019) (Beetlestone).  Plaintiff's responsibilities included responding to emergencies that arose at Boeing's facilities.  Id.  The Court concluded that repeatedly lifting heavy objects could exacerbate plaintiff's injury and more importantly, that if plaintiff experienced a flair-up during a response it could divert other first responders' resources away from the emergency on hand to dealing with plaintiff, putting firefighters and persons in need of help at further risk.  Id.  The Court held that this possibility, which defendants supported with medical records and outside reports, raised a triable issue of fact as to whether plaintiff may pose a direct threat, and thus denied summary judgment.  Here, the consequences of Young suffering a flair-up while on the assembly line are less severe.  At most, Young could exacerbate his injuries.  This Court cannot conclude at summary judgment that Young poses a direct threat to himself or others.

### 2. Discriminatory Intent

Under the <u>McDonnell Douglas</u> burden shifting framework when a plaintiff makes out a

prima facie case of discrimination, as Young has here, the burden shifts to the defendant to

establish that it produced a legitimate, non-discriminatory reason for the employee's termination.

<u>See Wright v. Providence Care Cntr. LLC</u>, 822 Fed. App'x 85, 91 (3d Cir. 2020) (non-

precedential).

### a. Legitimate Reason

Defendants assert that Jabil articulated a legitimate non-discriminatory reason for

Young's termination. Jabil's proffered reason is threefold: (1) Young was unable to perform the

essential functions the Operator role, with or without reasonable accommodation, (2) Young was

not qualified for any other positions, and (3) Jabil could not retain Young on indefinite leave.

MSJ at 10. Defendants point to Dr. Brenner's notes that indicate that Young could not return to

full-time work as an Operator. <u>Id.</u> at 11. Defendants further assert that Young was not qualified

for the Engineering Technician or machinist positions because he could not perform the essential

functions of the roles, did not have the requisite experience in either role, and both roles would

have constituted promotions. <u>Id.</u> Defendants have satisfied their burden to articulate a legitimate

non-discriminatory reason for Young's termination. The burden shifts back to Young to point to

evidence that Jabil's proffered reason for his termination was pretext.

### b. Pretext

Because Defendants stated a "legitimate, nondiscriminatory" reason for Jabil's action,

Young, to defeat summary judgment, must "point to some evidence, direct or circumstantial,

from which a fact finder could reasonably either (1) disbelieve [Jabil's] articulated legitimate

reasons; or (2) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of [Jabil's] action." <u>Lawrence v. Nat'l Westminster Bank of N.J.</u>, 98 F.3d 61, 66 (3d Cir. 1996). That is, Young must "produce[] sufficient evidence to raise a genuine issue of fact as to whether [Jabil's] proffered reasons were not its true reasons for the challenged employment action." <u>Sheridan v. E.I. DuPont de Nemours and Co.</u>, 100 F.3d 1061, 1067 (3d Cir. 1996) (*en banc*).

Jabil's intent in terminating Young is a factual question. <u>See Walton v. Mental Health Ass'n of Southeastern Pa.</u>, 168 F.3d 661, 668 (3d Cir. 1999) (citing <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 899 (3d Cir. 1987) (*en banc*) (abrogated on other grounds)). Therefore, if Young "can point to evidence that calls into question [Jabil's] intent, [he] raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment." <u>Id.</u> (internal citations omitted). Young can satisfy this burden by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Jabil's] proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that [Jabil] did not act for the asserted non-discriminatory reasons." <u>Fuentes v. Perskie</u>, 32 F.3d 759, 765 (3d Cir. 1994) (internal citations omitted).

Young argues that Jabil's proffered reason for his termination was pretext because he could perform the Operator role, as (1) Operators take breaks, (2) 15-20 breaks while assembling a lot would cause no danger to the device's traceability, and (3) part-time work would cause no danger to traceability, as Young could choose which lots to assemble, to ensure completion before the end of shift. Resp. at 8. As previously discussed, whether traceability is an essential Operator function is a question of fact that must be decided by a jury. Thus, whether Young's requested breaks would impact his ability to perform the Operator role and justify his termination cannot be decided at summary judgment. Moreover, Willman, Young's supervisor, testified that

Operators take breaks.  Def. Willman Dep. at 24:18-24.  This supports Young's assertion that breaks would not impact his ability to perform the Operator role and calls into question Jabil's proffered reason for Young's termination.  While Defendants argue that the medical questionnaire completed by Dr. Brenner indicated that Young could not perform any physical demands, Young contends that with his requested accommodation he would have been able to perform the Operator role.  MSJ at 1; Resp. at 8.  Young has identified sufficient evidence to raise a genuine question of material fact as to whether Jabil's proffered reason for his termination was pretextual.  Summary judgment on the discrimination claim is denied.

### B.  Sub-Count I: Failure to Accommodate

To establish a failure to accommodate claim under the ADA a plaintiff must establish that "(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated."  Capps v. Mondelez Global, LLC, 847 F.3d 144, 157 (3d Cir. 2017) (quoting Armstrong v. Burdette Tomlin Mem'l Hosp., 438 F.3d 240, 246 (3d Cir. 2006)).

For the purposes of this Motion, the first two elements are undisputed.  MSJ at 12.  The parties dispute only whether (1) Jabil made a good faith effort to assist Young, and (2) Young could have been reasonably accommodated.  Id.  As an initial matter, because this Court has concluded that there are factual disputes central to whether Young was a qualified individual at the time of his termination, summary judgment must be denied.  See Daniel v. T-Mobile USA, Inc., 2019 WL 2088839, at *17 (E.D. Pa. May 10, 2019) (Baylson).  However, in independently reviewing Young's failure to accomodate claim, this Court finds that material facts exist that preclude summary judgment.

### 1. Good Faith Effort

An employer is required "to engage in an 'interactive process' of communication with [the employee] so that the employer will be able to ... assist in identifying reasonable accommodations where appropriate." Dzuryacgko v. Teva Pharma. USA, Inc., 2022 WL 837180, at *5 (E.D. Pa. Mar. 21, 2022) (Rufe) (quoting Williams v. Phila. Housing Auth. Police Dep't, 380 F.3d 751, 771 (3d Cir. 2004) (superseded by statue on other grounds)). "This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." Taylor, 184 F.3d at 313. During the interactive process, both the employer and employee "have a duty to assist in the search for an appropriate reasonable accommodation and to act in good faith" Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 330 (3d Cir. 2003). While an employer's failure to engage in the interactive process does not, by itself, support a distinct claim, it "supports a finding that the employer did not make a good faith effort to assist the employee in identifying reasonable accommodations." Watson v. Drexel Univ., 2020 WL 576358, at *5 (E.D. Pa. Sept. 28, 2020) (Robreno).

To demonstrate that an employer failed to engage in the interactive process a plaintiff must show that: "1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith." Conneen, 334 F.3d at 330-31 (citing Taylor, 184 F.3d at 319-20).

The parties' characterizations of Young's accommodation process vary drastically. Defendants contend that Jabil accommodated Young with a medical leave of absence from July 12, 2021, through January 2022, and again from January 2022, until Young exhausted his

disability leave in June of 2022. MSJ. at 13. Defendants further contend that even after Young exhausted his leave, Jabil continued to try to find additional accommodations, until October 2022. Id. Young does not dispute that he was granted these medical leaves. However, this is where the agreement regarding the accommodation process ends.

Defendants assert that Young could not have been transferred to either the Engineering Technician or machinist roles. Defendants contend that the Engineering Technician role was a promotion and required physical demands that Young could not perform, specifically lifting 5-25 pounds on a regular basis. MSJ at 15-16. In contrast, Young maintains that he was qualified for the Engineering Technician role. Young asserts that (1) there was an open position for which he proactively applied, (2) Guie only consulted Jabil's in-house counsel regarding his application and did not speak with the recruiter or hiring manager, and (3) as an internal candidate he was guaranteed at least an interview or conversation, which he was not afforded because Guie messaged the recruiter asking her to "reject Maurice Young until we fill the role he is an internal candidate." Resp. at 9-10; Pl. Ex. M.

There is evidence in the record to support both Defendants' and Young's portrayal of events. The job posting for the Engineering Technician position stated that "other requirements" of the job were to "lift 5-25 pounds on a regular basis along with occasional heavy lifting over 50 pounds." MSJ at 16; Def. Young Dep. Ex. 18. It is also true that Dr. Brenner advised that Young limit walking, standing, sitting, reaching, lifting, bending, working and reaching due to his disability. Def. Facts at ¶ 47; Def. Young Dep. Ex. 13. However, in requesting that he be considered for the Engineering Technician role, Young emailed Guie, "I can show my doctor the job description [for the Engineering Technician role] to show Jabil I can perform those duties."

Pl. Ex. E.  Young further explained that he was qualified for the role because he had an

engineering degree from Drexel University.  Id.

Defendants point to Young's deposition testimony to support their contention that the

Engineering Technician position would have been a promotion because Young did not have prior

experience in an engineering role, and it provided higher pay than the Operator role.  MSJ at 15.

When asked, Young agreed that he had not worked in an engineering role before.  Id.; Def.

Young Dep. at 222:12-14.  However, Young had an engineering degree and testified that he met

"most or all" of the requirements for the role.  Def. Young Dep. at 167:9-15.  Next, Defendants

state that "[a]ny entry level engineering position or machinist role would have been a promotion

as the proposed jobs had higher salaries than his Operator I role."  Def's Facts at ⁋ 66.  This

misrepresents Young's testimony.  Young was thrice asked whether the Engineering Technician

position was a promotion or provided higher pay.  Each time, he answered that he was unaware if

the position was a promotion and that he believed that the pay for the Engineering Technician

position was similar to what he made as an Operator.  Def. Young Dep. 166:5-167:18.[6]

---

[6] Young engaged in the following exchange regarding whether the Engineering Technician I position was a
promotion:

> Q: Engineering would have been a promotion?
>
> A: Any entry level engineering, any engineering tech position.  The job description I read from that, which
> I applied for the position, everything in there I could do; if not do, be in-house trained on, like I seen
> anybody else in the past.
>
> Q: Just to be clear, those roles would have been promotions?
>
> Mr. Delgaizo: Objection.
>
> A: I don't know if they're considered promotions or not.
>
> Q: They were more pay?
>
> A: I don't know if all of them were more pay. I only can speak on I know the machinist was more pay. I
> know the engineering position is more pay. I don't know if the engineering tech position is more pay
> because it's different levels of engineering tech position there. The requirement to the engineering tech
> position, some of it is kind of low, like it's a beginner. Then, when I Googled some – I don't know if it was

Defendants provide no further evidence to support their claim that the Engineering Technician position was a promotion.

Moreover, Young presents evidence that his application for the Engineering Technician role was treated differently than other applications. Guie testified that for internal candidates, Jabil "want[ed] to at least interview them or talk to them." Resp. at 9-10; Pl. Guie Dep. at 101:15-20. However, Guie also messaged the recruiter, Welch, and asked her to not "reject Maurice Young until we fill the role he is an internal candidate." Id.; Pl. Ex. M. Young maintains that he was never interviewed or even afforded an informal conversation regarding his application. Id. There are genuine questions of material fact as to whether Jabil made a good faith effort to assist Young in seeking an accommodation.

### 2. Reasonable Accommodation

Defendants argue that Young could not have been reasonably accommodated because even if Young's requested part-time schedule was provided, Young would still not have been able to perform repetitive motions and the frequent breaks would have prevented Young from fulfilling the traceability requirement, both core functions of the Operator role. MSJ at 14-17.

As it is a question of fact for the jury whether repetitive motions and traceability were essential Operator functions, this Court cannot grant summary judgment on the basis that Young may not have been able to perform those functions. Moreover, as discussed, there is also a genuine question as to whether Young's request to transition to the Engineering Technician position was reasonable. Summary judgment on the failure to accommodate claim is denied as there are genuine questions as to whether Young was a qualified individual, Jabil engaged in the

---

on their site or something – the pay was somewhere around my pay. To answer your question, I don't know if that's an up in pay. Looking at the requirements of the job, I've either had most or all of that through working at Jabil, through some of my education at Drexel and Delaware County Community College. See Def. Pl. Dep. 166:5-167:15.

interactive process in good faith, and Young's requested accommodations of a part-time schedule or transfer to the Engineering Technician position were reasonable.

### C. Count II: ADA Retaliation

As an initial matter, "in view of the Court's finding on the ADA claim, there is no need for any specific finding of fact on the retaliation claim, as both claims are intertwined and if the one goes to trial, then Plaintiff can proceed on the other." Penson v. Phila. Presbytery Homes, Inc., 2018 WL 4561614, at *6 (E.D. Pa. Sept. 21, 2018) (Baylson)). However, in independently reviewing Young's retaliation claim, this Court finds that material facts exist that preclude summary judgment.

"To establish a *prima facie* case for retaliation under Title VII, [Young] must tender evidence that: (1) []he engaged in activity protected by Title VII; (2) [Jabil] took an adverse employment action against h[im]; and (3) there was a causal connection between h[is] participation in the protected activity and the adverse action." Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006)).

To establish a causal connection "a plaintiff must show either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism, coupled with timing, to establish a causal link." Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 258 (3d Cir. 2014). Where the temporal proximity between the protected activity and the adverse action is not unusually suggestive, courts ask whether "the proffered evidence, looked at as a whole, may suffice to raise the inference." Farrell v. Planters Lifesavers Co., 206 F.3d 271, 284 (3d Cir. 2000). That is because the "mere passage of time is not legally conclusive proof against retaliation." Robinson v. SEPTA, 982 F.2d 892, 894 (3d Cir.

1993).  Courts must "look to the intervening period for other evidence of retaliatory animus." Krouse v. Am. Sterilizer Co., 126 F.3d 494, 504-04 (3d Cir. 1997).

For purposes of this Motion, the parties do not dispute that the first two elements are met. MSJ at 20.  Therefore, Young's retaliation claim turns on whether he has provided sufficient evidence of a causal connection between his request for an accommodation and termination.

### 1. Suggestive Temporal Proximity

As a preliminary matter, the parties dispute what activity triggers Young's retaliation claim.  Defendants argue that the relevant activity is Young's first medical leave of absence, commencing in July 2021.  MSJ at 21.  In contrast, Young contends that the relevant activity is either his June 28, 2022, request to return to work on a part-time schedule or his October 29, 2022, application to the Engineering Technician position.  Resp. at 11-12.[7]

In his Amended Complaint Young alleges that he "engaged in protected activity when he requested accommodations and when he took a leave of absence, and/or received an accommodation in extended leave of absence, related to his disability."  Am. Compl. at ¶ 22. Viewing the evidence in the light most favorable to Young, the relevant protected activity is Young's June 28, 2022, request to return to work part-time.  This also comports with caselaw from this district that holds that for plaintiffs that take FMLA leave, the relevant protected activity is not the date that the FMLA leave commences but the date that the leave ends.[8]

---

[7] This Court notes that the latest protected activity alleged is Young's application for the Engineering Technician position.  However, since Young's application, posed as a requested accommodation, occurred after Young was informed that he would be terminated, it cannot serve as the relevant protected activity.  See Clark v. U.S. Steel Corp., 2025 WL 949601, at *5 (W.D. Pa. Mar. 28, 2025).

[8] See Pierre v. Woods Servs., Inc., 2021 WL 84068, at *3 (E.D. Pa. Jan. 11, 2021) (Kearney) ("[Defendant] provides us with no case from our Court of Appeals holding protected activity for an FMLA retaliation claim is confined only to the start of FMLA leave, with the remainder of the approved leave to be ignored, to show causation through temporal proximity.").

Over four months elapsed between Young's June 28, 2022, accommodation request for part-time work and November 1, 2022, termination. "'Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity' courts typically consider periods of days or weeks, not months." Dudhi v. Temple Health Oaks Lung Ctr., 2019 WL 426145, at 8 (E.D. Pa. Feb. 4, 2019) (Kelly) (quoting Blakney v. City of Phila., 559 Fed. App'x 183, 186 (3d Cir. 2014) (non-precedential)). The Third Circuit has previously found that a three-month gap was not unduly suggestive, LeBoon v. Lancaster Jewish Comm. Ctr. Ass'n, 503 F.3d 217, 232-33 (3d Cir. 2017), and that periods of time greater than ten days require "supplementary evidence of retaliatory motive," Blakney, 559 Fed. App'x at 183. A four-month period between an accommodation request and adverse employment action is not unduly suggestive.

### 2. Evidence as a Whole

A plaintiff may establish a causal connection by showing that their employer gave inconsistent explanations for their termination, as Jabil did here.[9]

Viewed as a whole, there is sufficient evidence to support Young's retaliation claim. Jabil sent Young two letters that identified the essential Operator functions, on September 12, 2022, and October 28, 2022, respectively. The September 12, 2022, letter identified nine essential Operator functions. See Pl. Ex. C. The October 28, 2022, letter identified the same essential functions as well as two additional essential functions not included in the September 12, 2022, letter: (1) finish the specific lot before any break is taken for quality assurance, and (2) finish the assigned lot before leaving for the day. See Pl. Ex. B. Willman confirmed that the second additional function was information that he relayed to Guie. Pl. Willman Dep. at 59:2-6. However, Willman testified that the first additional function was contrary to his understanding of

---

[9] See Waddell v. Small Tube Products, Inc., 799 F.2d 69, 73 (3d Cir. 1986); EEOC v. L.B. Foster Co., 123 F.3d 746, 753-54 (3d Cir. 1997), cert denied, 522 U.S. 1147 (1998); Farrell, 206 F.3d at 280-81.

the Operator role.  Id. at 58:15 – 59:1.  Guie testified that she (1) is unaware of the source of the first additional function, see Pl. Guie Dep. at 82:1-20, (2) unaware of any changes to the Operator role between September 12, 2022, and October 28, 2022, id. at 82:5-7, and (3) had not identified the essential Operator functions as of September 12, 2022, id. at 69:23-25 – 70:1.  Jabil premised Young's termination on his inability to perform the essential Operator functions, including that the "operator must finish the assigned lot before leaving for the day."  Jabil has offered no explanation for the inconsistencies in the essential functions of the role, the purported basis for which it terminated Young.

Jabil has also offered inconsistent explanations for why Young was not permitted to transfer to the Engineering Technician position.  Jabil claims that it was because Young was unqualified, and the position constituted a promotion.  However, two days after Young requested the transfer, Guie messaged Welch and asked that Young's application not be denied until the position was filled.  See Pl. Ex. M.  Typically, internal candidates are offered an interview or informal conversation, an opportunity not afforded to Young.

This evidence, taken as a whole, raises a genuine question as to causation and could allow a reasonable jury to conclude that Jabil's proffered reasons for Young's termination were pretextual.

### D.  Punitive Damages

"Punitive damages are available under the ADA when 'the complaining party demonstrates that the respondent engaged in a discriminatory practice ... with malice or with reckless indifference.'"  Gagliardo v. Connaught Lab., Inc., 311 F.3d 565, 573 (3d Cir. 2002) (quoting 42 U.S.C. § 1981(a)(b)(1)).  The terms "malice" and "reckless" indifference "focus on the employer's state of mind and require that 'an employer must at least discriminate in the face

of a perceived risk that its actions will violate federal law.'" Id. (quoting Kolstad v. Am. Dental Ass'n, 527 U.S. 535-35 (1999)).

In Gagliardo, there was sufficient evidence to support the jury's award of punitive damages where the plaintiff presented evidence that her employer was aware of her multiple sclerosis (MS) diagnosis, plaintiff's employer requested information concerning MS, plaintiff advised her employer of the limitations MS imposed on her ability to perform her job, plaintiff requested accommodation on multiple occasions, and plaintiff's employer was aware of plaintiff's federal disability rights. Gagliardo, 311 F.3d at 573. Similar facts exist here: Jabil was aware of Young's disability, Jabil requested additional information concerning Young's disability, Young advised Jabil of the limitations his disability imposed on his ability to perform the Operator role, Young requested accommodation on multiple occasions, and Jabil was aware of Young's federal disability rights. Viewing the record as a whole, there are genuine factual issues as to whether Jabil acted with malice or reckless indifference to Young's ADA rights.

## V.    **CONCLUSION**

For the reasons stated above Defendants' Motion for Summary Judgment is DENIED.