IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAURICE A. YOUNG,<br>                             *Plaintiff*,<br><br>    v.<br><br>JABIL, INC. and JABIL BRANDYWINE, INC.,<br>                            *Defendants*. | CIVIL ACTION<br><br>NO. 23-4992 |

Baylson, J.                                                                                                                                                                      May 19, 2025

**MEMORANDUM RE: DEFENDANTS' DAUBERT MOTION**

      Presently before the Court is Defendants' Motion to Strike the Report and Testimony of Dr. John Dieckman ("<u>Daubert</u> Motion"). For the reasons detailed below, the <u>Daubert</u> Motion will be denied.

**I.    FACTUAL BACKGROUND**

      Plaintiff, Maurice Young ("Young"), was employed by Defendant, Jabil, Inc. ("Jabil") in the role of Machine Operator I ("Operator") from June 2019 until his termination on November 1, 2022. Am. Compl. at ¶ 8, ECF 9. Young suffers from osteoarthritis in his hips which limits his ability to stand, sit, and walk. <u>Id.</u> at ¶ 10.

      Young took a leave of absence from July 2021 until January 2022 and a second leave of absence from January 2022, until he exhausted his disability insurance in June 2022. Defendants' Statement of Undisputed Facts ("Def. Facts") at ¶¶ 16, 20, 22, 25, 26, ECF 22-3. Following the exhaustion of his disability benefits, on June 27, 2022, Young texted Jabil's Senior Regional Human Resources Manager, Jennifer Guie ("Guie") and asked to return to work on a light-duty, part-time status. <u>Id.</u> at ¶ 28. Guie informed Young that his doctor would need to complete medical paperwork, including an "ADA Questionnaire," so that Jabil could determine accommodations for his return to work. <u>Id.</u> at ¶ 29, 32-33.

Young submitted his medical paperwork on July 18, 2022, twelve days late. Id. at ¶¶ 34, 46. On September 12, 2022, Guie requested additional information from Young. Pl. Ex. C, ECF 23-6. On October 26, 2022, after still not receiving a response, Young texted Guie to inquire about the status of his accommodation request. Pl. Ex. E, ECF 23-8. Two days later, on October 28, 2022, Guie sent Young a message that stated that Jabil would not be able to provide the accommodations and could not identify a vacant position for which Young was qualified and that as such Young would be terminated as of November 1, 2022. Def. Facts at ¶ 86.

On October 29, 2022, Young applied for the Engineering Technician I position ("Engineering Technician"). Id. at ¶ 88. Young emailed Guie and asked for a new accommodation, that he be allowed to transfer from the Operator role to the Engineering Technician position. Pl. Ex. E. On October 31, 2022, Guie sent a Microsoft Teams chat to Chelsea Welch ("Welch"), Jabil's recruiter, and asked Welch to not reject Young's application until the Engineering Technician position was filled because Young was an internal candidate. Pl. Ex. M, ECF 23-16. On November 1, 2022, Guie emailed Young that Jabil could not accommodate his request to transfer to the Engineering Technician position and Young's employment with Jabil was officially terminated. Pl. Ex. N, ECF 23-17; Def. Facts at ¶ 93.

## II.  PROCEDURAL HISTORY

Defendants filed the Daubert Motion, ECF 21, on January 31, 2025, the same day they filed a Motion for Summary Judgment, ECF 22. Young filed a Response to the Motion for Summary Judgment, ECF 23, on February 13, 2025, and the next day, February 14, 2025, a Response to the Daubert Motion, ECF 24. Defendants filed a Reply in support of the Daubert Motion on February 20, 2025. ECF 27. Following a Reply, ECF 25, and Surreply, ECF 28, the Court denied summary judgment, noting that in so doing it did not rely on the Expert Report,

attached as an Exhibit to Young's summary judgment Response, ECF 37.  A Final Pretrial Conference was held on April 23, 2025, ECF 39, 41, at which time trial was set for June 16, 2025, ECF 42.

### III. DIECKMAN'S REPORT

At issue is the Vocational Assessment and Analysis of Lost Earnings ("Report"), ECF 21-4, of Plaintiff's expert, Dr. John Dieckman ("Dieckman").  Dieckman is a Certified Rehabilitation Counselor and Certified Disability Management Rehabilitation Specialist.  See Pl. Ex. B, ECF 24-4.  Dieckman has held the position of Assistant Vocational Director at Proto-Worx since 2000.  Id.  At Proto-Worx, Dieckman oversees the development, training, supervision, and direction of vocational staff.  Id.  Additionally, Dieckman's responsibilities at Proto-Worx include testifying "for purposes of forensic testimony, wage loss, liability and lost earning capacity in cases involving employment, ADA and reasonable accommodation."  Id.  Dieckman has previously testified regarding wage loss, liability, and economic recovery in federal and state courts as well as in administrative hearings.  Id.  Dieckman's Report opined that Young would have been able to perform other jobs at Jabil, including the Engineering Technician position.  Pl. Ex. A, ECF 24-3.  Additionally, Dieckman opined that Young lost at least $36,563 in earnings and $6,033 in benefits.  Id.

### IV. PARTIES' CONTENTIONS

#### A. Defendants' Daubert Motion

Defendants seek to preclude Dieckman's Report as it pertains to both his ADA and Loss of Earnings findings.  Defendants primarily argue that Dieckman is unqualified and utilized an unreliable methodology, which in turn makes him unable to opine on the central issues of this case or assist the jury.  Defendants' specific arguments are as follows:

3

**ADA Arguments**

1. Dieckman is not a qualified expert as to ADA compliance because Dieckman does not have any medical training or licenses, Mot. at 4-5;

2. Dieckman's methodology regarding ADA compliance is unreliable because his finding that Jabil did not provide Young a reasonable accommodation was based solely on public job descriptions and conversations with Young, Mot. at 8;

3. Dieckman cannot opine on whether Jabil provided Young a reasonable accommodation because Dieckman did not interview anyone at Jabil as to what positions Young could perform or review job postings from the relevant period, Mot. at 10.

**Economic Loss Arguments**

1. Dieckman is not a qualified expert as to economic losses because Dieckman does not have any economics or business certifications or training, Mot. at 6-7;

2. Dieckman's methodology regarding economic losses is unreliable because his finding that Young was entitled to economic losses was based on open positions as of May 2024, whereas the economic loss assessment covers the period between July 2022 and March 2023, Mot. at 8, and was calculated based on full time employment when Young was on a part-time schedule prior to his termination, Mot. at 9;

3. Dieckman cannot opine on whether Jabil violated the ADA because Dieckman cannot provide a conclusion as to whether Young's requested accommodations were an undue burden or whether Jabil should have placed Young into a new position, Mot. at 10;

4. Dieckman's conclusions regarding Young's economic losses would not help the jury because they are purely speculative, Mot. at 11.

### B. Plaintiff's Response to Defendants' Daubert Motion

Young asserts that Dieckman's Report should not be precluded on any basis. Young primarily argues that Dieckman is qualified, Dieckman utilized a reliable methodology, and Dieckman's Report will assist the jury. Young's specific arguments are as follows:

**ADA Arguments**

1. Dieckman does not require a medical degree to testify as to a vocational assessment, Resp. at 6-7, 9;

2. Dieckman's methodology regarding ADA compliance is reliable because Dieckman reviewed Young's work history, the physician completed ADA questionnaire, and Jabil specific job descriptions, Resp. at 11;

3. Dieckman's findings regarding ADA compliance assist the jury in determining whether an accommodation or re-assignment was feasible, Resp. at 13;

**Economic Loss Arguments**

1. Dieckman does not require a finance degree or economics background to calculate the wage loss damages, Resp. at 6-7, 9;

2. Dieckman's methodology regarding economic losses is reliable because Dieckman's findings are grounded in the record which is supported by the fact that Defendants applied the same calculation, Resp. at 11-12;

3. Dieckman's findings regarding economic loss may assist the jury in calculating harms suffered as a result of the alleged violation, Resp. at 13;

### C. Defendants' Reply in Support of the Daubert Motion

In the Reply Brief, Defendants argue that Young's assertation, that Dieckman's testimony is not scientific and thus not bound by Daubert's scientific reliability parameters, is erroneous.

Reply at 2. Defendants further argue that Young's reliance on Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000), in which the Third Circuit considered a vocational expert to have greater knowledge than the average layperson, is misplaced. Reply at 2-4. Defendants argue that Dieckman's qualifications are inferior to those of the vocational expert in Elcock and that like the vocational expert in Elcock, Dieckman's method was unreliable. Reply at 3-4.

V. **LEGAL STANDARD**

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 ("Rule 702"). Rule 702 "has a liberal policy of admissibility." Pineda v. Ford Motor Co., 520 F.3d 237, 243 (3d Cir. 2008) (quoting Kannankeril v. Terminix Int'l, Inc., 128 F.3d 802, 806 (3d Cir. 1997)). Thus, the "rejection of expert testimony is the exception and not the rule." Dorman Prod., Inc. v. Paccar, Inc., 201 F.Supp.3d 663, 686 (E.D. Pa. 2016) (DuBois) (internal citations omitted). For expert testimony to be admissible, "(1) the proffered witness must be an expert; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact." Pineda, 520 F.3d at 243 (quoting Kannankeril, 128 F.3d at 806). "Rule 702 embodies three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." Elcock, 233 F.3d at 741 (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-44 (3d Cir. 1994) ("Paoli")). The party offering the expert must prove each of these requirements by a preponderance of the evidence. In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999).

VI. **DISCUSSION**

   D. **Qualification**

With respect to qualification, "Rule 702 requires the witness to have 'specialized knowledge' regarding the area of testimony." Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300

6

F.3d 325, 335 (3d Cir.2002) (quoting <u>Waldorf v. Shuta</u>, 142 F.3d 601, 625 (3d Cir.1998)). The Third Circuit has instructed courts to interpret the qualification requirement "liberally" and not to insist on a certain kind of degree or background when evaluating the qualifications of an expert. <u>See Waldorf</u>, 142 F.3d at 625. "The language of Rule 702 and the accompanying advisory committee notes make clear that various kinds of 'knowledge, skill, experience, training, or education,' qualify an expert as such." <u>Paoli</u>, 916 F.2d at 855 (quoting Fed. R. Evid. 702).

Moreover, "[t]his liberal policy of admissibility extends to the substantive as well as the formal qualifications of experts." <u>Pineda</u>, 520 F.3d at 244. Thus, "it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." <u>Id.</u> (quoting <u>Holbrook v. Lykes Bros. S.S. Co.</u>, 80 F.3d 777, 782 (3d Cir.1996)).

In <u>Elcock</u>, the Third Circuit recognized that vocational experts may qualify as expert witnesses and that the expert at issue had "substantially more knowledge than an average lay person regarding employment opportunities for disabled individuals." <u>Elcock</u>, 233 F.3d at 745. Dieckman is a qualified vocational expert. Unlike the expert in <u>Elcock</u>, Dieckman has formal training in vocational rehabilitation. <u>Id.</u> at 743. Dieckman is a Certified Rehabilitation Counselor and Certified Disability Management Specialist. Pl. Ex. B. Additionally, Dieckman's practical experience is more relevant to the field of vocational assessment than was the expert's in <u>Elcock</u>. Whereas the <u>Elcock</u> expert had helped those with substance abuse issues return to employment and worked at the Virgin Islands Division of Workers' Compensation, <u>id.</u>, Dieckman has over thirty years' experience as an Assistant Vocational Director wherein he has performed vocational evaluations of injured and disabled individuals and produced reports

regarding wage and earning loss. Id. Like in Elcock where the expert's prior experience providing expert testimony was relevant to the Third Circuit's conclusion that the expert was qualified, Dieckman has provided expert testimony in numerous federal, state, and administrative proceedings over the last twenty-five years. Pl. Ex. B.

### E. Reliability

For the testimony of a qualified witness to be admissible under Rule 702, the witness must also use a methodology or technique that is reliable. Paoli, 35 F.3d at 742. The test for reliability "is not whether a particular scientific opinion has the best foundation, or even whether the foundation is supported by the best methodology or unassailable research. Instead, the court looks to whether the expert's testimony is supported by 'good grounds.'" Karlo v. Pittsburgh Glass Works, LLC, 849 F.3d 61, 81 (3d Cir. 2017); In re Domestic Drywall Antitrust Litig., 2020 WL 1695434, at *15 (E.D. Pa. Apr. 7, 2020) (Baylson) ("Domestic Drywall") ("The court's focus in assessing reliability must be solely on principles and methodology, not on the conclusions that they generate.") (internal quotations omitted). The standard for reliability is "not that high" and is lower than the "merits standard of correctness." Karlo, 849 F.3d at 81.

The Third Circuit identified eight factors relevant to ascertain whether "good grounds" support potential expert testimony:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness

8

testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

Paoli, 35 F.3d at 742 n.8. These factors are not exhaustive and may not apply in every case. See Domestic Drywall, 2020 WL 1695434, at *15.

Courts in this Circuit have found vocational counselors' opinions to meet the Daubert requirements where they "relied upon sufficient measurements and observations in forming [their] opinions." Orner v. Nat'l Beef Packaging Co., LLC, 2015 WL 8334544, at *10 (M.D. Pa. Dec. 9, 2015). For example, in Orner, a vocational expert opined on a potential reasonable accommodation for a plaintiff. Id. at *11. To reach his conclusion, the expert reviewed two pertinent treatises, met with the plaintiff, visited the plaintiff's workplace, observed the plaintiff's work environment, and researched potential accommodations that would satisfy the plaintiff's needs without posing a hazard to others. Id. at *9. The district court concluded that the expert utilized "a sufficiently reliable methodology" that "can be replicated, tested, verified, or debunked by defendant's own experts." Id. "[G]iven the nature of a vocational rehabilitation analyst's work, it is reasonable for [an expert's assessment to be based on] a certain amount of research, investigation, and consultation with the injured individual." Id. at * 10; see also Malcolm v. Regal Ideas, Inc., 2021 WL 3006653, at *2, 4 (E.D. Pa. July 15, 2021) (Baylson) (holding that a vocational expert's opinions were "a far cry from relying on 'blind assumptions' about [plaintiff's] condition" and were admissible when the assessment was based on an in-person examination of the plaintiff). When an expert has utilized a "sufficiently reliable methodology," challenges concerning the factual foundation on which their opinion rests, including why they did not test a subject or why they deemed some measurements or information to be irrelevant or relevant, may be vetted through cross-examination. See Orner, 2015 WL

8334544, at *9, 11; Weirich v. Horst Realty Co., LLC, 2009 WL 920960, at *4-5 (E.D. Pa. Mar. 30, 2009) (Golden).

Dieckman's Report meets the Daubert standard. Dieckman articulated his methodology and the sources on which he relied. Dieckman explained that his vocational assessment was based on a review of numerous documents, including Jabil performance reviews of Young, the Jabil physician questionnaire, emails between Young and Jabil employees regarding the accommodation process, and a review of Jabil job listings. Pl. Ex. B. Dieckman explained that his analysis of lost earnings was based on a review of Young's W-2 forms and taxes between 2018 and 2023. Pl. Ex. B. This is not a case like Elcock, where the expert did not provide "an inkling as to the standards controlling [his] method." Elcock, 233 F.3d at 747-48. Also unlike in Elcock, Dieckman conducted an in-person interview of Young. Pl. Ex. B. Dieckman's Report is thus a 'far cry from relying on 'blind assumptions' about [Young's] condition." Malcolm, 2021 WL 3006653, at *4. [1]

Defendants' challenge to Dieckman's vocational assessment pertains to Dieckman's failure to interview any Jabil employees. Mot. at 8, 10. Like in Orner, Defendants' challenge is to the Report's "credibility, completeness, and thoroughness" and can be "addressed through vigorous cross-examination [rather] than through threshold exclusion." Orner, 2015 WL 8334544, at *11; see also Kasinger v. Walmart Stores, Inc., 2024 WL 1526040, at *8 (E.D. Pa. Apr. 9, 2024) (Surrick).

---

[1] In Elcock, the expert based his report on a blind assumption that the plaintiff was 100% disabled, even though another expert described the plaintiff as between 50 and either 60 or 75% disabled. The Third Circuit held that the expert's assumptions lacked foundation in the record and upheld the expert's exclusion. See Elcock, 233 F.3d at 246-49.

10

Defendants' challenge to Dieckman's analysis of lost earnings pertains to Dieckman's use of open positions as of May 2024 instead of July 2022 to March 2023 and calculation of lost earnings based on full-time employment. Mot. at 8, 9.

As to Dieckman's use of positions available as of May 2024, the test for reliability is not whether a particular method "has the best foundation, or even whether the foundation is supported by the best methodology." Karlo, 849 F.3d at 81. Rather, the test is whether the method is supported by "good grounds." Id. Dieckman was aware, from his interview with Young and review of the records, that Young had applied for an open Engineering Technician position. See Pl. Ex. A. While Dieckman reviewed additional job postings as of May 2024, and determined that Young would have been able to fulfill the requirements for most of the positions, this does not negate Dieckman's knowledge of at least one open position from the relevant period that he determined Young was able to perform.

Further, Dieckman's use of full-time employment to calculate Young's lost earnings is premised on the assumption that had Jabil provided Young a reasonable accommodation, such as a transfer to the Engineering Technician position, Young would have been able to return to work full-time. Pl. Ex. A. Courts in this Circuit have held that the future earning capacity model, which would allow for greater damages than identified by Dieckman's Report, "is an accepted and reliable method for calculating future lost earnings." Comm. Assoc. Underwriters of Am., Inc. v. Queensboro Flooring Corp., 2016 WL 1728384, at *8 (M.D. Pa. Apr. 29, 2016). Additionally, courts have found that the omission of earnings factors such as independent contractor status, limited actual earnings in relevant years, and downward adjustments for potential future lost income "do not undermine the reliability of [an expert's] calculations of [a plaintiff's] future earning capacity, even if the incorporation of these factors into [the expert's

11

model] would have more accurately reflected the amount of income that [a plaintiff] was most likely to actually realize." Id. (citing Paoli, 35 F.3d at 744).

### F. FIT

Rule 702 also requires the proposed testimony "fit the facts and the context of the case in which it is offered." Domestic Drywall, 2020 WL 1695434, at *16. "An expert's testimony fits the case if the testimony will assist the trier of fact." Id. (citing Paoli, 35 F.3d at 743). The standard for fit is the same standard as the one for reliability; it is "not that high." Paoli, 35 F.3d at 745. "Fit" is met when the proposed scientific knowledge is connected to a question at issue. Id. at 745 n.13; see also Daubert v. Merrell Dow Pharm., 509 U.S. 579, 591 (1993) ("Expert testimony which does not relate to any issue in the case is not relevant and ergo, non-helpful [to the factfinder].").

Dieckman's vocational assessment and wage loss analysis is connected to the questions presented in this case, namely whether (1) Jabil failed to reasonably accommodated Young, and (2) if Jabil violated the ADA, what damages Young is entitled to. Dieckman's assessment will assist the trier of fact in answering whether Young was able to perform other positions at Jabil and what wages Young lost as a result of his termination. Thus, there is a sufficient nexus between the facts of the case and Dieckman's Report to satisfy the "fit" standard.

### G. Oral Argument

The decision to hold a Daubert hearing is discretionary with the Court and is not necessary when "the facts upon which the court must make its determination have been adequately presented to the court in the parties' papers and accompanying exhibits." Parkinson v. Guidant Corp., 315 F.Supp.2d 754, 756 n. 1 (W.D. Pa. 2004) (citing Paoli, 35 F.3d at 749).

Based on the Court's review of Dieckman's Report and the parties' submissions, which the Court finds are sufficient to render a determination, a <u>Daubert</u> hearing is not warranted in this case.

## VII.    CONCLUSIONS

For the reasons stated above, Defendants' Daubert Motion is DENIED.